UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| BRANDON CARL LOWE, | CASE NO. 5:22-CV-01126-BYP |
| Plaintiff, | JUDGE BENITA Y. PEARSON |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

INTRODUCTION

Plaintiff Brandon Lowe challenges the Commissioner of Social Security's decision denying supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On June 27, 2022, pursuant to Local Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated June 27, 2022). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

PROCEDURAL BACKGROUND

Mr. Lowe filed for SSI on April 2, 2020, alleging a disability onset date of August 26, 2019. (Tr. 183-92). The claim was denied initially and on reconsideration. (Tr. 93-100, 102-10). Mr. Lowe then requested a hearing before an administrative law judge. (Tr. 125-27). Mr. Lowe (represented by counsel) and a vocational expert (VE) testified at a hearing before the ALJ on

1

February 4, 2021. (Tr. 54-91). On March 30, 2021, the ALJ issued a written decision finding Mr. Lowe not disabled. (Tr. 10-27). The Appeals Council denied Mr. Lowe's request for review, making the hearing decision the final decision of the Commissioner. (Tr.1-6; *see* 20 C.F.R. §§ 416.1455 and 416.1481). Mr. Lowe timely filed this action on June 27, 2022. (ECF #1).

FACTUAL BACKGROUND

I.      PERSONAL AND VOCATIONAL EVIDENCE

Mr. Lowe was 25 years old on his alleged onset date, and 26 years old at the administrative hearing. (Tr. 62). Mr. Lowe completed high school. (Tr. 62). Mr. Lowe has worked several jobs in retail and performing manual labor, which the ALJ noted were all "very short" in duration. (Tr. 63-65).

II.     RELEVANT MEDICAL EVIDENCE

On April 29, 2019, Mr. Lowe presented to Mercy Medical Center complaining of stomach discomfort and mood swings. (Tr. 290). Mr. Lowe reported not taking Celexa for three or four days and experiencing abdominal discomfort and mood swings when he attempted to restart the medication. (*Id.*). He was assessed with anxiety and was instructed to stop taking Celexa and follow up with a primary care doctor. (Tr. 291).

In August 2019, Mr. Lowe sought treatment with chiropractor George Shiepis, D.C., after he was in a car accident. (Tr. 390). Mr. Lowe reported the accident caused neck, back, knee, and hip pain, migraine headaches, dizziness, difficulty sleeping, and numbness and tingling in his hands. (Tr. 391). He identified bending, walking, movement, twisting, and lifting as aggravating factors. (*Id.*). His cervical, thoracic, and lumbar spine displayed restricted range of motion with pain, and paraspinal studies revealed pain with palpation. (Tr. 392-93). On August 8, Mr. Lowe

displayed restricted spinal range of motion; cervical, thoracic, and lumbar muscle tension, bilaterally; and tenderness to palpation of the paraspinal muscles. (Tr. 388-89). Dr. Shiepis noted Mr. Lowe's progress was limited by his severe migraine and neck pain. (Tr. 389). On August 12, Mr. Lowe reported slight improvement in cervical, thoracic, and lumbar pain. (Tr. 384). Dr. Shiepis noted similar physical examination findings and recommended spinal X-rays. (Tr. 387). The X-rays revealed spondylosis deformans in the mid- to lower thoracic spine and facet arthrosis at L5-S1. (Tr. 379). Two additional sessions of chiropractic care resulted in some overall improvement to Mr. Lowe's pain, but he continued to display restricted range of spinal motion and spinal musculature tension. (*See* Tr. 380, 382, 384).

On August 27, 2019, Mr. Lowe was admitted for psychiatric evaluation when he felt suicidal and planned to overdose on medication. (Tr. 264). James Psarras, M.D., noted Mr. Lowe was admitted in November 2018 and diagnosed with major depression, for which he was prescribed Celexa and Trazadone. (*Id.*). Mr. Lowe reported he stopped taking the prescriptions and stopped attending his outpatient follow-up appointments after the initial admission because he felt overwhelmed and had IBS, but wanted to get back on medication. (*Id.*). Mental status examination revealed a flat affect, clear speech without evidence of psychosis, and abnormal suicidal thoughts backed by a plan. (*Id.*). Dr. Psarras found normal cognitive functioning, as evidenced by Mr. Lowe's ability to recall three of three objects, the events leading to his hospitalization, and childhood developmental history. (Tr. 265). Mr. Lowe could calculate by serial 7s; therefore, his attention and concentration were normal. (*Id.*). Judgment and insight were fair. (*Id.*).

Mr. Lowe was discharged on August 30, 2019 after attending group and individual therapy and re-starting medication, including Celexa and Trazadone. (Tr. 262). Dr. Psarras felt Mr. Lowe

was no longer an acute risk, could better handle stressors, and showed signs of improvement. (*Id.*).
Mental status examination at discharge revealed "not as withdrawn" behavior, "not as flat" mood
and affect, clear speech, logical thought process, and improved judgment and insight. (*Id.*).

On February 6, 2020, Mr. Lowe met with Benjamin Swisher, M.D., to establish care as a
new patient and discuss prescriptions for anxiety and depression. (Tr. 402). Dr. Swisher noted an
anxious mood and somewhat flat affect, but physical examination was otherwise normal. (Tr. 402-
03). He prescribed Celexa, encouraged Mr. Lowe to set up counseling sessions, and referred him to
a gastrointestinal doctor for his IBS. (Tr. 403).

On February 21, 2020, Mr. Lowe met with Allison Osineye, of Coleman Behavioral
Health, for a diagnostic assessment. (Tr. 349). He reported attending University of Akron and
Stark State College to study early childhood education, but his anxiety "made it really hard" and
he did not graduate. (Tr. 350). He explained he had more than ten jobs in the last five years, last
worked three weeks prior to the assessment, and was no longer working due to anxiety. (Tr. 351).
Mr. Lowe reported having few coping skills, family difficulties, poor social life, financial struggles,
and poor self-care. (Tr. 357). He did not report any community involvement, volunteer activities,
or interests. (*Id.*). Mental status examination revealed a cooperative and withdrawn mood and
avoidant eye contact. (Tr. 358). He was diagnosed with PTSD and major depressive disorder. (Tr.
365-66).

On March 26, 2020, Mr. Lowe spoke with Emily Tamas of Coleman Behavioral Health for
his first counseling session via telehealth appointment. (Tr. 300, 302). Mental status examination
revealed cooperative behavior, average eye contact and activity, clear speech, euthymic mood,
congruent affect, and a logical thought process. (Tr. 300-01). Mr. Lowe did not report any

4

impairment of memory, attention, or concentration. (Tr. 301). Mr. Lowe endorsed feeling as though he is about to have a panic attack when he goes out in public and reported that when he wants to do something productive, "stress gets in the way and I fall into a hole." (Tr. 301). His coping strategies include going on walks, going outside, and cleaning up. (Tr. 301-02). Mr. Lowe endorsed struggling with symptoms of depression and anxiety, including staying at home, avoiding people, and often feeling paranoid. (Tr. 302, 304).

On April 7, 2020, Mr. Lowe attended another telehealth appointment with Ms. Tamas and endorsed a decrease in anxiety because he was not leaving home often. (Tr. 309). He reported spending a lot of time with his cat and using coloring books to cope. (*Id.*). On April 21, Mr. Lowe reported having "really bad nightmares" and sleeping only three hours per night. (Tr. 311). He missed an appointment with his psychiatrist and had been out of medication for three days. (*Id.*).

On May 6, 2020, Mr. Lowe had another telehealth appointment with Ms. Tamas. (Tr. 317). There, he expressed frustration due to changes in his living environment and reported a confrontation with a new neighbor about noise. (Tr. 317, 320). He claimed to be coping "okay." (Tr. 320). On May 12, Mr. Lowe reported continued depression but that he was getting out of the house more often. (Tr. 322-23). On May 20, Mr. Lowe reported he planted flowers for his neighbor and was getting out of the house by going on walks. (Tr. 326, 330). On June 2, Mr. Lowe indicated further problems with his neighbor trying to break into his apartment. (Tr. 332). He reported frustration and anxiety. (Tr. 333).

On June 4, 2020, Mr. Lowe had a telehealth appointment with Ms. Tamas, who noted attention and concentration impairment. (Tr. 338-39). Mr. Lowe explained his neighbor was evicted but expressed worry that the person still knows where he lives. (Tr. 339). He reported

5

anxiety, depression, and procrastination regarding his medications and upcoming appointments. (*Id.*). He also endorsed keeping himself busy and trying to get out of the house when he can. (Tr. 342).

On July 6, 2020, Mr. Lowe met with Mark Dal Pra, C.N.P., for a psychiatric session during which he reported avoiding activities and having anxiety to the point of not leaving his home, problems with sleep, being irritable, and having angry outbursts. (Tr. 371). He requested a change in medication and received a prescription for Prozac in lieu of Celexa. (Tr. 375).

On July 15, 2020, Mr. Lowe had a telehealth appointment with Ms. Tamas and reported the ability to schedule and keep appointments, that he was going to the store, had been trying to get out of the house as much as possible, and was spending time with his mother, who helped him fill out his disability paperwork. (Tr. 347).

On August 3, Mr. Lowe had a psychiatric appointment with Nurse Dal Pra and reported his anxiety was worse and he was experiencing panic attacks, anger, and sadness. (Tr. 493). During a panic attack, he feels like he is unable to breath and his mind races. (*Id.*). He also reported feeling down and hopeless when he wakes. (*Id.*). Nurse Dal Pra continued Mr. Lowe's prescriptions for Prozac and mirtazapine. (Tr. 497).

On August 4, Mr. Lowe reported to Ms. Tamas an increase in nightmare frequency and indicated he was adjusting to his new apartment and playing video games again. (Tr. 440-41). He reported an increase in functioning, that he was getting out of the house more often, and had been effectively maintaining communication with his new landlord. (Tr. 443). His coping mechanisms were playing video games and spending time with his mother. (Tr. 449).

On August 19, 2020, Mr. Lowe had a telehealth appointment with Dr. Swisher where he reported severe back spasms for a few weeks and informed the doctor of his current medications, including Prozac and Remeron. (Tr. 404). Dr. Swisher referred Mr. Lowe for physical therapy and prescribed Flexeril and naproxen for pain. (*Id.*).

During a September 2, 2020 telehealth appointment with Ms. Tamas, Mr. Lowe reported continued depression. (Tr. 453). He discussed exploring employment as a security guard. (*Id.*).

On September 8, Mr. Lowe met with Nurse Dal Pra and reported isolating from others and having a poor mood. (Tr. 499). He noted his appetite had increased, but he was vomiting at times and had nausea and an upset stomach. (*Id.*). Mr. Lowe complained of worsened anxiety despite medication compliance. (Tr. 503). Nurse Dal Pra continued his medications. (*Id.*).

On September 22, Mr. Lowe reported to Ms. Tamas "pretty bad anxiety" and pain in his neck. (Tr. 458). He indicated having difficulty finding a job. (*Id.*). He stated he plays video games and spends time with his new cat to assist with symptom management. (Tr. 461). On September 30, Mr. Lowe reported he would meet with employment services the following week. (Tr. 468).

On October 19, Mr. Lowe met with Nurse Dal Pra and noted his upcoming telephone interview. (Tr. 505). He reported worsened anxiety. (Tr. 509). Nurse Dal Pra continued his medications. (*Id.*).

On October 22, 2020, at Mr. Lowe's telehealth appointment with Ms. Tamas, he explained the interview went well and he was offered a job, but he was nervous to show up so he "called and made up an excuse to not go." (Tr. 474). Mr. Lowe was supposed to report to work the day of this appointment but reported being nervous. (*Id.*). He expressed frustration and feeling guilty about not showing up. (Tr. 470).

7

On November 12, Mr. Lowe reported to Ms. Tamas that he had an anxiety attack yesterday and "left early." (Tr. 475). On November 19, 2020, Mr. Lowe reported to Ms. Tamas that he lost his job and quit taking his medication. (Tr. 481).

On November 30, 2020, Mr. Lowe had another telehealth appointment with Dr. Swisher and complained of IBS and a hemorrhoid flare-up. (Tr. 406). Dr. Swisher prescribed a cream and suggested Mr. Lowe increase his fiber intake. (*Id.*).

On December 3, Mr. Lowe indicated to Ms. Tamas he was back on Trazadone again and it helped him fall asleep quicker. (Tr. 486). Mr. Lowe also reported mood swings and sleeping more often. (*Id.*). On December 12, he reported submitting employment applications, reaching out to his mom for support when needed, and not taking Trazadone again because he was taking naps throughout the day and felt unproductive. (Tr. 489).

On January 6, 2021, Mr. Lowe had a telehealth appointment with a new psychiatric provider, Judy Chava, C.N.P. (Tr. 511). Mr. Lowe reported feeling stressed about his upcoming disability hearing. (*Id.*). He complained that mirtazapine made him tired during the day and induced mood swings. (*Id.*). Nurse Chava prescribed Trazadone for sleep, continued Prozac, and discontinued mirtazapine. (Tr. 516).

On February 2, 2021, Mr. Lowe reported to Ms. Tamas that he was feeling nervous and anxious about his upcoming disability hearing. (Tr. 409). He also reported continuing attempts to work and indicated he had an appointment with supportive employment the next day and was hoping to get a job at Walmart. (Tr. 492).

III.    MEDICAL OPINIONS

On August 3, 2020, Dr. Shiepis determined Mr. Lowe was restricted to lifting thirty pounds; he found no limitation with Mr. Lowe's ability to sit, stand, carry, handle objects, hear, speak, or travel. (Tr. 378).

On August 5, 2020, State agency medical consultant Leon Hughes, M.D., reviewed Mr. Lowe's medical records from August 2019 and determined he was not disabled. (Tr. 94, 99-100). Dr. Hughes determined Mr. Lowe could occasionally lift and/or carry twenty pounds and ten pounds frequently; stand and/or walk for a total of six hours in an eight-hour workday; sit for a total of six hours in an eight-hour workday; frequently climb ladders, ropes, and scaffolds; and frequently stoop, kneel, crouch, and crawl. (Tr. 97). On reconsideration, another State agency medical consultant, W. Scott Bolz, M.D., reviewed the records and determined the documentation supported Dr. Hughes' initial residual functional capacity assessment. (Tr. 107).

Likewise, State agency psychiatric consultant, Cynthia Waggoner, Psy.D., reviewed Mr. Lowe's mental health treatment records through July 2020 and determined he was moderately limited in interacting with others and adapting/managing himself; mildly limited in concentrating, persisting, and maintaining pace; and not limited in his ability to understand, remember, or apply information. (Tr. 94-96). On reconsideration, State agency consultant Jennifer Swain[1] adopted Dr. Waggoner's initial determination. (Tr. 108).

---

[1]    Jennifer Swain did not provide her credentials when signing the mental RFC assessment but stated her Medical Specialty Code as 38, for psychology and signed in her capacity as a psychological consultant (*See* Tr. 108).

## IV.    OTHER RELEVANT EVIDENCE

On July 14, 2020, Mr. Lowe completed an Adult Function Report detailing how his conditions affect his ability to work. (Tr. 221-28). Mr. Lowe indicated he does not sleep well enough to keep a schedule; anxiety and PTSD make it difficult, "sometimes impossible," to drive or go anywhere; he is unable to focus on learning new things; his back pain makes it hard to do physical work; he has problems interacting with others; and he has IBS flares every time he starts working and is afraid to embarrass himself. (Tr. 221). Specifically, Mr. Lowe indicated his conditions affect his abilities to lift, squat, bend, stand, reach, talk, complete tasks, concentrate, remember, understand, follow directions, and get along with others. (Tr. 226). Before his conditions, Mr. Lowe could work, socialize, and sleep through the night. (Tr. 222). Additionally, his mood, memory and attention were better. (*Id.*). Now, Mr. Lowe sleepwalks, and he has nightmares and wakes up screaming and hitting the walls. (*Id.*).

Mr. Lowe can feed his cats and change their litter. (*Id.*). He needs reminders from his mother to take his medications, clean, and do laundry. (*Id.*). He can do household cleaning chores and laundry, but his mother must regularly remind him. (*Id.*). Mr. Lowe explained he gets behind on dishes and housework because of his depression. (Tr. 224). He makes frozen dinners and sandwiches but must watch what he eats due to IBS. (Tr. 223).

Mr. Lowe goes outside every day, mainly to smoke. (Tr. 224). He can drive but avoids it due to anxiety. (*Id.*). He has been in car accidents and driving can trigger his anxiety. (*Id.*). He is not always comfortable going out alone and noted his mother usually drives him when he needs groceries. (*Id.*). He engages in limited hobbies, including watching television daily, and coloring and playing video games a few times a week. (Tr. 225). His social activities include talking to

10

neighbors and family a few times a week. (*Id.*). However, Mr. Lowe also endorses problems getting along with family, friends, and neighbors and does not usually feel like talking. (Tr. 226). He sometimes presents as angry or frustrated and "this can cause fights or misunderstandings." (*Id.*). Since the onset of his conditions, Mr. Lowe does not like to be around people as much as he used to because of his anxiety/PTSD. (*Id.*).

Mr. Lowe estimated he can walk between a quarter- and a half-mile before needing to rest for a few minutes. (*Id.*). He can pay attention for a minute or two and does not finish what he starts. (*Id.*). His mother helps him to understand written instructions and paperwork. (*Id.*). He can sometimes follow spoken instructions but does not listen and absorb the information, so written instructions are better because he can refer to them when needed. (*Id.*).

Mr. Lowe tries to be respectful of authority figures and has never been fired from a job due to problems with getting along with others. (Tr. 227). He does not handle stress or changes in routine well and is prone to panic attacks. (*Id.*).

## V.   ADMINISTRATIVE HEARING

The administrative hearing occurred by telephone on February 4, 2021 due to the Covid-19 pandemic. There, Mr. Lowe testified he studied carpentry in high school but has never worked in the field. (Tr. 63). He endorsed past employment at Walmart, P.M. Fulton, and Kratzer, LLC, and explained he lost these positions for missing work after being in a car accident, missing work due to an IBS accident, and having a panic attack, respectively. (Tr. 63-64). The ALJ noted Mr. Lowe's most recent past work history, including attempts to work, were short in duration. (Tr. 64). Mr. Lowe also worked for a geotechnical drilling company in 2015 as a general laborer, and for

Birds Unlimited in 2017 in a part-time capacity. (Tr. 64-65). He was fired from the general laborer position after he experienced an IBS flare-up. (Tr. 66).

Mr. Lowe is unable to work a full-time job because he does not feel comfortable leaving his house due to social anxiety and IBS. (Tr. 66). He last saw a gastroenterology specialist about three years before the hearing because his specialist retired. (Tr. 68). Mr. Lowe is currently waiting to get an appointment with a local gastroenterology specialist. (Tr. 67). His primary care physician's suggestion to eat more fiber did not help. (*Id.*). Mr. Lowe's IBS flares up three to four times a week, particularly when his anxiety is bad. (Tr. 68). When these flare-ups occur, Mr. Lowe's stomach begins cramping, his bladder feels very tight, and it becomes hard to do anything but lie down. (*Id.*). Flare-ups are very painful and can stop his whole day, whereas regular days are characterized by constant stomach discomfort. (Tr. 75). Mr. Lowe stopped taking IBS medication last fall after experiencing a bad mental health episode where he did not keep appointments with his doctors or stay current on medication refills. (Tr. 69). Mr. Lowe regularly uses the restroom at least ten times a day and typically spends fifteen to twenty-five minutes in the bathroom each time. (Tr. 75). When he has the urge to go, he cannot wait and must use the restroom immediately. (*Id.*).

Because of panic attacks, flashbacks, and crying episodes, Mr. Lowe does not leave his house often. (Tr. 69). He explained the panic attacks and crying episodes do not happen often because he avoids leaving the house. (Tr. 70). When they occur, panic attacks last between ten minutes and an hour. (*Id.*). Mr. Lowe usually needs his mother to accompany him when he leaves the house. (Tr. 76). Mr. Lowe's telehealth appointments make it much easier to get treatment. (*Id.*). He does not believe he could attend his appointments in person due to his anxiety. (*Id.*).

Mr. Lowe also discussed running out of medication because his anxiety and PTSD made it so he could not leave the house to have his prescriptions filled. (Tr. 81). Missing doses would cause withdrawal symptoms. (*Id.*). Mr. Lowe has resolved this issue by switching medications and having his prescriptions delivered to his house. (*Id.*). At the hearing, Mr. Lowe reported last leaving his house three days previous to grab coffee from the store. (Tr. 77).

Mr. Lowe has chronic back pain, located in the lower back, between his shoulder blades, and into his neck, dating back to his freshman or sophomore year of high school. (Tr. 70, 71). The pain travels down into his left leg and up into his neck. (Tr. 77). Mr. Lowe has a medical marijuana card and uses the drug for pain relief. (Tr. 78). The drug is also helpful for his IBS. (*Id.*). He does not receive medical marijuana in the mail as with his other medications, but his mother normally takes him to pick up the drug. (Tr. 82).

He endorsed physical therapy being helpful, but that he has been focusing more on treating his mental health issues than his physical impairments. (Tr. 70). He was referred for physical therapy but has yet to follow through with the appointments. (*Id.*). Otherwise, Mr. Lowe treated with a chiropractor but reports it made his pain worse. (Tr. 71). He takes prescription and over-the-counter medications, stretches, and bathes to relieve the pain. (*Id.*). These treatments help sometimes, but not always. (*Id.*). The pain comes and goes and is aggravated by being on his feet too long or sitting too long. (Tr. 72). Mr. Lowe estimates he can comfortably lift and/or carry twenty to thirty-five pounds up to one-third of an eight-hour workday, walk for a half-mile to a mile before needing to rest, and sit for an hour or an hour and a half before needing to reposition for about fifteen minutes. (Tr. 72, 77).

13

On a typical day, Mr. Lowe wakes up, feeds his cats, takes his medication, watches television, plays video games, then takes a nap. (Tr. 73). After a nap, Mr. Lowe calls his mother, plays video games, makes dinner, watches television, and goes to bed. (*Id.*). Sometimes he plays online video games where others also participate. (*Id.*). He plays video games for a total of five to six hours a day. (*Id.*). Mr. Lowe sometimes drives, but mainly relies on his mother to drive him to the grocery store and helps him shop. (*Id.*). Mr. Lowe's mother helps him with doing dishes, cleaning up the house, doing laundry, shopping, and paying bills. (Tr. 74). When asked about other friends and family, Mr. Lowe identified only his mother and his little brother. (*Id.*). He has one other friend he talks to "a couple of times a year." (*Id.*).

VE William Kiger then testified. He identified Mr. Lowe's past relevant work as driller helper, DOT #930.666-010, heavy exertion, unskilled, SVP 2. (Tr. 83). The ALJ asked if a hypothetical individual of Mr. Lowe's age, education, and experience could perform Mr. Lowe's past relevant work if limited to light exertion work and restricted as follows: frequently climb ladders, ropes, and scaffolds; frequently stoop, kneel, crouch, and crawl; adapt to a relatively static setting with frequent changes; and superficial interaction with others, meaning the person should not be required to perform work tasks that involve customer service duties, confrontation, conflict resolution, collaboration, directing the work of others, persuading or influencing others, or being responsible for the safety or welfare of others. (Tr. 84). VE Kiger responded the hypothetical individual would not be able to perform Mr. Lowe's past relevant work, but could perform a range of light, unskilled, SVP 2 jobs, including assembler of small products (DOT #706.684-022, 300,000 jobs nationally), housekeeping, cleaner (DOT #323.687-014, 200,000 jobs nationally), and router (DOT #222.587-038, 35,000 jobs nationally). (Tr. 84-85).

If the hypothetical individual was limited to all of the identified restrictions, but further limited to sedentary exertion work, the individual would not be able to perform Mr. Lowe's past relevant work, but could perform other jobs, including document preparer (DOT #249.587-018, 20,000 jobs nationally), cutter-paster (DOT #249.587-014, 12,000 jobs nationally), and nut sorter (DOT #521.687-086, 2,300 jobs nationally). (Tr. 85-86).

The VE also testified employers tolerate no more than 15% off-task behavior in an eight-hour workday and no more than one day of absence per month. (Tr. 86). Very brief extra breaks, less than five minutes, in the morning and afternoon are tolerated to grab a drink of water or go to the restroom. (Tr. 86-87).

Mr. Lowe's counsel then questioned VE Kiger. If, under the first hypothetical, the individual also required five extra breaks every day, fifteen minutes each in duration, to use the restroom, the individual would not be able to perform any competitive work. (Tr. 87-88). The hypothetical individual would also be precluded from competitive work if he required a fifteen-minute break after one and a half hours of work throughout the day. (Tr. 89).

### THE ALJ'S DECISION

The ALJ's decision included the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since April 2, 2020, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairment: degenerative disc disease of the thoracic spine with stenosis; facet arthrosis of the lumbar spine with spinal strain; irritable bowel disease; major depressive disorder; anxiety; and posttraumatic stress disorder (PTSD) (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).

15

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except: The claimant can frequently climb ladders, ropes, and scaffolds and frequently stoop, kneel, crouch, and crawl. He can adapt to a relatively static setting with infrequent changes. The claimant can have superficial interaction with others, meaning he should not be required to perform work tasks that involve customer service duties, confrontation, conflict resolution, collaboration, directing the work of others, persuading or influence others, or being responsible for the safety or welfare of others.

5.    The claimant is unable to perform any past relevant work (20 CFR 416.965).

7.    The claimant was born on July 26, 1994, and was 25 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

8.    The claimant has at least a high school education (20 CFR 416.964).

9.    Transferability of job skills is not an issue because the claimant's past relevant work is unskilled (20 CFR 416.968)

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

11.    The claimant has not been under a disability, as defined in the Social Security Act, since April 2, 2020, the date the application was filed (20 CFR 416.920(g)).

(Tr. 15-22).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is

more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

Even if substantial evidence supports the decision, a district court will not uphold that decision when the ALJ failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision … will not be upheld

[when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right"); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004) (Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights). Furthermore, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11:13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.      Does the severe impairment meet one of the listed impairments?

4.      What is claimant's residual functional capacity and can claimant perform past relevant work?

5.      Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Mr. Lowe claims the ALJ's Step Three findings related to Listings 12.04 and 12.15 and the residual functional capacity (RFC) assessment are not supported by substantial evidence, and the ALJ did not properly evaluate his symptoms in accordance with Social Security Ruling (SSR) 16-3p. (Pl.'s Br., ECF #8, PageID 578). The Commissioner responds that the ALJ's findings at Step Three were consistent with the prior administrative medical findings of the State agency psychologists, Mr. Lowe has not identified any medical source opinions finding his impairment caused more limitations than set forth in the RFC, and his argument about the analysis of his symptoms should be rejected because district courts may not disturb the ALJ's analysis, or the

19

conclusions drawn from it, absent compelling reasons that do not exist here. (Comm'r's Br., ECF #10, PageID 603-04).

**A.  The ALJ's Step Three findings are supported by substantial evidence.**

At Step Three of the sequential evaluation, if the claimant meets a listed impairment or its medical equivalent, the claimant will be found disabled, and the remaining steps of the analysis are abandoned. 20 C.F.R. § 416.920(a)(4)(iii); *Deaner v. Comm'r of Soc. Sec.*, 840 Fed. App'x 813, 817 (6th Cir. 2020). To meet a listed impairment and be deemed disabled at Step Three, the claimant must satisfy all the medical criteria of the listing (referred to as paragraph A) and, in relation to mental disorders, satisfy the functional criteria (referred to as paragraph B) or satisfy the "serious and persistent" criteria (referred to as paragraph C). 20 C.F.R. 404, Subpt. P, App. 1, 12.00A(2)(a), (b), (c). The claimant bears the burden of offering evidence to establish each element of a Listing. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

The paragraph B criteria represent the areas of mental functioning a person uses in a work setting: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. 20 C.F.R. 404, Subpt. P, App. 1, 12.00A(2)(b). To satisfy the paragraph B criteria, the claimant's mental disorder must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning. *Id.* A "marked" limitation means functioning independently, appropriately, effectively, and on a sustained basis is seriously limited, whereas an "extreme" limitation means the person is not able to function on a sustained basis. *Id.* at 12.00F(2). An ALJ must use all relevant medical and non-medical evidence available to evaluate a mental disorder, including the symptoms and signs of the disorder, reported

limitations in activities, and any help or support received that is necessary for a claimant to function. *Id.* at 12.00F(3).

Mr. Lowe argues he satisfied paragraphs A and B of Listings 12.04 (depressive, bipolar, and related disorders) and 12.15 (trauma- and stressor-related disorders) and, therefore, should have been found disabled at Step Three. Specifically, he argues the evidence demonstrates he is seriously, or markedly, limited in his abilities to interact with others; concentrate, persist, or maintain pace; and adapt or manage himself, and "the ALJ failed to provide an adequate explanation for failing to find two marked limitations in the 'B' criteria," and "[t]he evidence clearly established that Mr. Lowe had problems interacting with others due to his irritability, hyperarousal, poor concentration, and suicidal thoughts." (ECF #8 at PageID 589-90). The Commissioner does not dispute that Mr. Lowe satisfied the paragraph A criteria of Listings 12.04 and 12.15, but argues the ALJ's paragraph B findings were consistent with the record evidence and with prior administrative findings of the State agency psychologists who reviewed Mr. Lowe's records. (ECF #10 at PageID 612).

Here, the ALJ determined Mr. Lowe has moderate limitation in his abilities to interact with others and adapt or manage himself and mild limitation in his ability to concentrate, persist, and maintain pace. (Tr. 17). In interacting with others, the ALJ relied on Mr. Lowe's normal mental status evaluations and statements he made to his counselor and psychiatrist about his social anxiety, increased social interaction, disputes and altercations with neighbors, spending time with his cats, and feeling paranoid often to support her finding. (*Id.*). Likewise, in the area of concentrating, persisting, and maintaining pace, the ALJ relied on normal mental status examinations, statements made to his counselor and psychiatrist about his daily routine, and his

use of coloring books and video games to deal with stress, and statements in Mr. Lowe's Function Report about his abilities to care for personal hygiene and handle household chores to support her finding. (*Id.*). Additionally, the ALJ noted Mr. Lowe's endorsed difficulty with concentration and attention is not consistent with the evidence of record. (*Id.*). In adapting and managing oneself, the ALJ relied on Mr. Lowe's past suicide attempts; his activities, including coloring, watching television, going on walks, going outside, and cleaning up; euthymic mood; good daily routine; and his abilities to feed himself, take care of his personal hygiene, and perform household chores to support her finding. (*Id.*).

Mr. Lowe does not suggest the ALJ failed to consider any particular evidence; instead, he states the evidence established he does not socialize with others, but isolates himself, and has problems with irritability, hyperarousal, poor concentration, and suicidal thoughts. (ECF #8 at PageID 589-90). Essentially, Mr. Lowe claims there is substantial evidence to support marked limitations in the paragraph B criteria. The law is clear, however, that even if substantial evidence also supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones,* 336 F.3d at 477.

Finally, Mr. Lowe suggests, in a cursory fashion, that the ALJ inappropriately relied on his ability to perform some activities on a limited basis as substantial evidence that his symptoms were not disabling. (ECF #8 at PageID 590) (citing *Lorman v. Comm'r of Soc. Sec.,* No. 1:14-cv-701, 107 F. Supp. 3d 829, 838 (S.D. Ohio May 8, 2015) and *Aubin v. Comm'r of Soc. Sec.,* No. 1:20-CV-2206, 2022 WL 138080, *12 (N.D. Ohio 14, 2022)). This argument is not convincing, as the record makes clear the ALJ did not rely on Mr. Lowe's activities alone in making her Step Three findings, but also on objective evidence from mental status evaluations and Mr. Lowe's own statements

made at the hearing and to his providers. In *Lorman,* the ALJ noted the plaintiff could occasionally drive a car, eat food, dust, perform household duties, shop, watch movies, talk with her husband, and communicate with her sister by phone, and concluded these activities alone support a finding that plaintiff only has moderate limitations. 107 F. Supp. 3d at 838. The district court determined the plaintiff's ability to perform some activities on a limited basis is not substantial evidence that her symptoms are not disabling. *Id.* In *Aubin*, the plaintiff demonstrated he was unable to perform many of the identified activities on his own. 2022 WL 138080 at *12. Unlike in *Lorman* and *Aubin*, the ALJ did not rely on Mr. Lowe's daily activities alone to support her ruling, but also relied on objective medical evidence from mental status examinations.

Considering the foregoing, substantial evidence supports the ALJ's Step Three paragraph B determinations. I therefore recommend the District Court decline to remand on this basis.

**B.     The ALJ's RFC is supported by substantial evidence.**

**Next,** Mr. Lowe argues the ALJ erred in rendering the RFC by failing "to find that the effect of the combination of [Mr.] Lowe's symptoms, including pain, precluded him from the ability to engage in substantial gainful activity on a full-time and sustained basis." (ECF #8 at PageID 591). In support, Mr. Lowe recites a wealth of medical evidence that confirmed he "had pain issues exacerbated by his psychological impairments which interfered with his ability to sustain activities and maintain focus and concentration." (*Id.* at 593). He does not argue the ALJ did not consider any of the cited evidence, nor does he claim the ALJ's RFC is unsupported by substantial evidence. Rather, Mr. Lowe presents medical evidence and requests the Court find harmful error where the ALJ did not come to his preferred conclusion, that he was disabled. Mr.

Lowe's RFC argument is a request to re-weigh evidence and come to a different outcome. The District Court is precluded from engaging in such a review.

Substantial evidence supports the ALJ's conclusions. Therefore, I recommend the District Court decline to remand on this basis.

**C.      The ALJ did not err in her analysis of Mr. Lowe's symptoms.**

Finally, Mr. Lowe argues the ALJ did not analyze his symptoms in accordance with SSR 16-3p by failing to set forth specific reasons for her findings and failing to support her conclusions with substantial evidence. (ECF #8 at PageID 596). In addition, he claims the ALJ ignored or disregarded evidence documenting his disabling impairments but does not cite any alleged ignored or disregarded evidence. (*Id.* at PageID 597).

Under SSR 16-3p, the ALJ follows a two-step process for evaluating an individual's symptoms. First, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p. Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second stage, the ALJ considers all relevant evidence, including:

- a claimant's daily activities;

- the location, duration, frequency, and intensity of pain or other symptoms;

- factors that precipitate and aggravate the symptoms;

- the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

- treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;

- any measures other than treatment an individual uses or used to relieve pain or other symptoms; and

- any other factor concerning the claimant's functional limitations and restrictions due to pain and other symptoms.

20 C.F.R. § 404.1529(c)(3); *see also* SSR 16-3p. The ALJ is not required to analyze all seven factors, only those that are germane to the alleged symptoms. *See, e.g., Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005) ("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence."). The ALJ may consider evidence directly from the claimant or gleaned from other medical and non-medical sources. SSR 16-3p.

The ALJ is not required to accept the claimant's subjective complaints and may discount the claimant's subjective testimony when the ALJ finds it inconsistent with objective medical and other evidence. *Jones,* 336 F.3d at 475-76. The ALJ's decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent review can assess how the ALJ evaluated the individual's symptoms. SSR 16-3p. The ALJ need not use any "magic words," so long as it is clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021).

An ALJ's determination of subjective evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). This Court must accord great weight and deference to the ALJ's opinion of subjective evidence, due to the ALJ's opportunity to observe a claimant's demeanor during the hearing—an opportunity this Court is not afforded in its review. *Jones*, 336 F.3d at 476. Absent compelling reason, this Court may not disturb the ALJ's analysis of

the claimant's subjective complaints or the conclusions drawn from them. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]" *Ulman*, 693 F.3d at 713-14.

Here, the ALJ's decision, evaluated as a whole, shows she appropriately considered Mr. Lowe's statements about the intensity, persistence, and limiting effects of his symptoms and offered sufficient reasoning for not accepting those statements. For instance, she discounted Mr. Lowe's complaints of impaired concentration and memory because mental status examinations consistently showed no impairment. (Tr. 17). The ALJ also noted Mr. Lowe denied musculoskeletal pain with movement, weakness, joint pain, or pain that limited activities in February of 2020. (Tr. 19). Mr. Lowe's later complaint of severe muscle spasms was discounted because physical therapy improved his symptoms. (*Id.*). The ALJ also relied on Mr. Lowe's statements about getting out more, dealing with stress using coloring books, enjoying walks, doing "pretty well," trying to find more productive ways to cope with stress by going outside or playing video games, and his abilities to communicate his needs, live independently, and perform activities of daily living. Moreover, the ALJ considered the factors as required under 20 C.F.R. § 404.1529(c)(3).

While Mr. Lowe may be able to point to other evidence in the record that supports a different conclusion, the ALJ's conclusion is, itself, supported by substantial evidence and is sufficiently articulated such that the Court can follow the path of the ALJ's reasoning. Mr. Lowe has not shown the ALJ failed to consider certain evidence or that the ALJ discounted Mr. Lowe's

statements without reason. In short, Mr. Lowe offers no compelling reason to overturn the ALJ's

symptoms analysis. Therefore, I recommend the District Court decline to remand on this basis.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I

recommend the District Court **AFFIRM** the Commissioner's decision denying supplemental

security income.

Dated: April 18, 2023

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and
Recommendation, a party may serve and file specific written objections to the
proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R.
Civ. P. 72(b)(2);** *see also* **28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly
asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or
waiver of the right to raise the issue on appeal, either to the district judge or in a
subsequent appeal to the United States Court of Appeals, depending on how or
whether the party responds to the Report and Recommendation.** *Berkshire v.
Dahl,* **928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not
merely indicate a general objection to the entirety of the Report and
Recommendation; "a general objection has the same effect as would a failure to
object."** *Howard v. Sec'y of Health and Hum. Servs.,* **932 F.2d 505, 509 (6th Cir.
1991). Objections should focus on specific concerns and not merely restate the
arguments in briefs submitted to the Magistrate Judge. "A reexamination of the
exact same argument that was presented to the Magistrate Judge without specific
objections 'wastes judicial resources rather than saving them and runs contrary to
the purpose of the Magistrates Act.'"** *Overholt v. Green,* **No. 1:17-CV-00186,
2018 WL 3018175, at \*2 (W.D. Ky. June 15, 2018) (quoting** *Howard,* **932 F.2d at**

509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega,* 924 F.3d 868, 878-79 (6th Cir. 2019).